780 A.2d 605

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**James William BEGLEY, Appellant.**

Supreme Court of Pennsylvania.

Argued May 3, 2000.

Decided Sept. 26, 2001.

240

242

244

246

252

254

Alene C. Grabauskas, for James Begley.

Christy H. Fawcett, Robert A. Graci, for Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

### OPINION OF THE COURT

NIGRO, Justice.

On July 18, 1996, a jury found Appellant James William Begley guilty of the kidnapping and first-degree murder of Erica Miller. Following a penalty phase hearing, the jury found one aggravating circumstance, that the murder was committed during the course of a felony (kidnapping),[1] and two mitigating circumstances, that Appellant had no significant history of prior convictions,[2] and that he acted under the influence of an extreme mental or emotional disturbance.[3] After weighing the aggravating circumstance against the two mitigating circumstances, the jury concluded that the former outweighed the latter. Accordingly, the jury returned a verdict of death against Appellant. On August 26, 1996, the trial court formally imposed the death sentence against Appellant.[4] Appellant subsequently filed post sentence motions with the trial court, which the trial court denied on January 6, 1997. This direct appeal followed.[5] We now affirm Appellant's convictions for kidnapping and first-degree murder, but reverse the sentence of death and remand the case for a new penalty hearing.

I. *Appellant's claims that the evidence was insufficient to support his convictions for first-degree murder and kidnapping*

Appellant first claims that the evidence was insufficient to sustain his conviction for first-degree murder.[6] In

1. 42 Pa.C.S. § 9711(d)(6).

2. 42 Pa.C.S. § 9711(e)(1).

3. 42 Pa.C.S. § 9711(e)(2).

4. In addition, Appellant was sentenced to a consecutive sentence of ten to twenty years for his kidnapping conviction.

5. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of a sentence of death.

6. We note that even if Appellant did not raise a sufficiency of the evidence claim regarding his first-degree murder conviction in his

reviewing such a claim, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth, as the verdict winner, to determine whether the jury could have found that every element of the crime of first-degree murder was proven beyond a reasonable doubt. *See Commonwealth v. Michael*, 544 Pa. 105, 109–12, 674 A.2d 1044, 1047 (1996). To obtain a conviction for first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was committed with deliberation. *See* 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Rios*, 546 Pa. 271, 281, 684 A.2d 1025, 1030 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997). The specific intent to kill may be proven by circumstantial evidence, and may be inferred from the defendant's use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Bond*, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995).

The evidence adduced at trial includes and establishes the following: Brenda Miller testified that Appellant, her former boyfriend, kept in contact with her and her two teen-aged children, Erica and Charlie Miller. Appellant lived approximately two blocks away from the Miller residence in West York, Pennsylvania. Brenda Miller further testified that on January 17, 1995, she spent the evening at home with her boyfriend, Manuel, and Erica Miller. When Brenda Miller went to bed at around 9:30 p.m., Erica Miller was on the couch in the living room, where she usually slept. After Brenda and Manuel went to bed, but before they fell asleep, Brenda heard Erica ask someone something to the effect of whether they or someone else would still be up. Brenda Miller testified that she assumed that her daughter was talking with someone on

appeal to this Court, we would nevertheless be required to independently review the record to determine whether the Commonwealth established the elements necessary to sustain Appellant's conviction, because Appellant has been sentenced to death for his crime. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

the telephone, since no one else was in the house and she didn't hear anyone respond to Erica's question. When Brenda awoke the next morning, her daughter was nowhere to be found. However, there was no sign of a forced entry into the home, and Erica's cigarettes, lighter, and personal effects had been left sitting in the living room.

All efforts to locate Erica Miller proved fruitless until March 2, 1995, when the police received a 911 call from a friend of Appellant's named Tom March. Tom March told the police that he and his girlfriend, Cheryl Smith, had just discovered a body buried on their farm property. Tom March and Cheryl Smith led police officers responding to the call to a partially dug-up shallow grave located next to a barn on their property. The police continued the excavation initiated by Tom March and Cheryl Smith, and fully uncovered Erica Miller's body. The body was gagged and nude. On March 3, 1995, the police discovered a shotgun shell casing and two shotgun shell waddings at the gravesite.[7] An autopsy conducted by forensic pathologist Dr. Sarah Funke revealed that Erica Miller had been shot at close range twice in the back of the head.

The police arrested Appellant in connection with the homicide on March 3, 1995, the day after the discovery of Erica Miller's body. Upon arresting Appellant, the police discovered and seized a pair of black leather gloves from his person.[8] In addition, at the time of Appellant's arrest, the police impounded his car, and later obtained a warrant to search the car. Inside Appellant's car, the police discovered a roll of the same type of duct tape that had been used to gag Erica Miller. Richard Buechle, an expert materials analyst for the Federal Bureau of Investigations, testified at trial that he matched up

7. Erica Miller's coat was also found lying underneath her head. Blood, brain matter, and shotgun pellets were discovered on the coat.

8. Lee Ann Grayson, a serologist with the Pennsylvania State Police Crimes Lab, later examined the gloves and discovered a small trace of blood on the outside portion of the left-hand glove. However, due to the small amount of blood that she found on the glove, Ms. Grayson was unable to scientifically establish the source of the blood, or whether it was even human in origin.

the end of the roll of duct tape found in Appellant's car with the end of the duct tape used to gag Erica Miller.

At trial, the Commonwealth presented testimony from three separate witnesses, Charlie Miller, Sharon Buckingham, and Todd Schulz, which established that prior to her disappearance, Erica Miller claimed that she had been offered a secret government job, which would pay $15 an hour. Charlie Miller, Erica's brother, testified that he spoke with Erica on the telephone a few days before Erica's disappearance and in their conversation, Erica confided in him that Appellant offered her a job guarding a female victim/witness in a safe house. According to Charlie Miller, Erica told him that Appellant needed a woman to do the job because the victim/witness was a woman. Additionally, Charlie Miller testified that Erica told him that she was not supposed to say anything about the job because she was going to have to take a lie detector test. Erica explained to her brother that she only told him about the job because they were so close and she knew he wouldn't tell anybody. Similarly, Sharon Buckingham, a friend of the Millers, testified that a few days before Erica disappeared, Erica told her that she was going to get a job with the government for $15 an hour, that it was a classified position, and that she was not supposed to talk about the job. Finally, Todd Schulz, an acquaintance of Erica Miller's, testified that a few days before her disappearance, Erica told him that a friend offered her a job guarding a safe house for $15 an hour.

Some of the most damaging testimony against Appellant came from Tom March and Cheryl Smith. At trial, Tom March testified that in January of 1995, Appellant asked March if he could borrow March's shotgun to go squirrel hunting since March's shotgun had a longer barrel than his shotgun, which was more effective for hunting squirrels. March agreed to lend his shotgun to Appellant, and Appellant promised to clean March's shotgun before he returned it. According to March, he lent his shotgun to Appellant on January 16, 1995, the day before Erica Miller disappeared, and Appellant returned the shotgun to him, fully cleaned, on January 18, 1995, the day after Erica Miller disappeared.

Although March loaned Appellant five black shotgun shells along with his shotgun, none were returned to him.[9]

Tom March also testified that in the middle of January, Appellant asked March whether he could bury a box containing evidence and important papers related to his "private arms security business" and conduct a "prisoner exchange" on the farm property Tom March shared with Cheryl Smith. Appellant explained that he wanted to bury the box because it would help decrease his insurance payments. Tom March agreed to allow Appellant to bury his box and conduct a "prisoner exchange" on his property, but demanded that he do so at the end of the driveway by the barn, because he didn't want those things going on near his home and children.[10] Cheryl Smith subsequently testified that at approximately 7:45 a.m. on the day following Appellant's request to bury the box and conduct the prisoner exchange on the March/Smith property, she saw Appellant's car next to the barn when she walked her daughter to the bus stop. At that time, Cheryl Smith did not see Appellant, but later that day, Appellant came to her home and told her that he was done with his business at the barn and she could return to that area.

Furthermore, Tom March testified that on January 22, 1995, he asked Appellant to help him gut some deer. After they wrapped the deer meat, Appellant showed March a patch of freshly disturbed soil near the barn and told March that he

9. Ms. Grayson testified that she discovered a small trace of blood on the nozzle and inside the barrel of the shotgun that Tom March lent to Appellant. Like the blood found on Appellant's leather glove, Ms. Grayson could not scientifically identify the source of the blood found inside the barrel of March's shotgun nor could she positively identify the blood as human. However, Corporal Ernst Baltimore, a ballistics expert with the Pennsylvania State Police Crimes Lab, testified that the evidence seized from the grave was consistent with two shots being fired from the same type of shotgun that Tom March lent to Appellant. In addition, Dr. Funke and Ms. Grayson testified regarding "blow back theory," a phenomenon whereby some of the blood and tissue of a human or animal is blown back in the direction of the muzzle of the firearm used to shoot them.

10. Cheryl Smith testified that she overheard some portions of this conversation, including Appellant's explanation that his box contained important papers and that he wanted to bury the box for insurance purposes.

buried his box under that soil. According to March, Appellant visited him much more frequently after Appellant showed him where he buried his box. Additionally, Appellant repeatedly asked March if anyone had been around where the box was buried, and asked March if he was going to lay stones over the area where the box was buried.

On March 1, 1995, Appellant drove to Tom March's workplace and agreed to take March to get his picture taken for a photo I.D. license. On the way there, Appellant told March that someone had called a tavern near a hunting cabin that March and Appellant shared, and asked if anyone saw Appellant with a missing 19 year-old girl at the tavern.[11] Tom March found it extremely odd that someone would make such a telephone call, and told Cheryl Smith about his conversation with Appellant that same night. Cheryl Smith testified that upon hearing about the conversation, she recalled seeing a poster in the grocery store about a missing 19 year-old girl from the West York area. March, and especially Smith, became suspicious of the box that Appellant buried on their property. Cheryl Smith demanded that they dig up the box to discover its true contents. After arguing with Smith, March agreed to dig up the box. On the evening of March 2, 1995, the two drove to the barn and began to dig in the spot where Appellant told March he buried his box. Tom March eventually uncovered what he thought was a wrapping around the box and directed Cheryl Smith to get his razor blade so he could cut through it. In the meantime, March continued digging, and uncovered what he immediately recognized to be a human arm. Shocked at their discovery, March and Smith jumped into their truck, sped down the drive to their home and called 911.

Viewed in the light most favorable to the Commonwealth as verdict-winner, the foregoing evidence, with all reasonable inferences derived therefrom, is clearly sufficient to sustain

11. Brenda Miller testified that she called the tavern to inquire if anyone saw Appellant there with Erica Miller, as she began to suspect that Appellant abducted Erica.

Appellant's first-degree murder conviction for the killing of Erica Miller.

Next, we shall consider Appellant's claim that the evidence was insufficient to support a verdict that Appellant was guilty of kidnapping Erica Miller. This claim fails.[12]

Kidnapping is established if the Commonwealth proves beyond a reasonable doubt that the defendant unlawfully removed another a substantial distance from the place where he or she is found, or that he unlawfully confined another for a substantial period in a place of isolation with the intention of inflicting bodily injury on or to terrorize the victim. 18 Pa.C.S. § 2901(a). A removal or confinement of a victim who is over the age of fourteen and is not incapacitated is unlawful for purposes of establishing a kidnapping if it is accomplished by force, threat, or deception. 18 Pa.C.S. § 2901(b). The elements of kidnapping can be proven circumstantially. *Commonwealth v. Chester*, 526 Pa. 578, 608–09, 587 A.2d 1367, 1382 (1991).

At trial, the Commonwealth presented circumstantial evidence that Erica Miller intended to accept a job from Appellant around the time of her disappearance. The Commonwealth also presented evidence that Erica Miller was ultimately found a substantial distance from where she was last seen—her mother's home. In addition, the place where Erica Miller was ultimately found—next to a barn on the March/Smith property—could certainly be reasonably considered a place of isolation. Finally, there was evidence that Erica was stripped of her clothes and gagged before she was murdered, which further indicates that she was confined against her will in a place of isolation. Thus, the Commonwealth presented circumstantial evidence tending to establish that Appellant lured Erica from her home based on a deception, took her a substantial distance to an isolated portion of the March/Smith property, gagged and

12. Appellant also argues that the evidence was insufficient for the trial court to submit the charge of kidnapping to the jury for consideration. Because we find that the evidence supported the jury's verdict of guilt for kidnapping, we find it unnecessary to address this claim.

stripped her, dug a grave for her, placed her or forced her into the grave, and killed her. This circumstantial evidence is sufficient to support the jury's finding that Appellant kidnapped Erica Miller. *See Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995) (finding circumstantial evidence sufficient to support kidnapping conviction where victim was last seen alive in defendant's company, her body was later found in a remote area some distance from where she was last seen, and there was evidence that a rope had been tied around her leg); *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991) (finding circumstantial evidence sufficient to support kidnapping conviction where the victim was last seen leaving a bar in the company of the defendants and the victim's body was later found in a wooded area some distance away).

II. *Appellant's claim that his convictions for first-degree murder and kidnapping are not supported by the weight of the evidence*

█ Appellant contends that the jury's verdicts of guilty on the charges of first-degree murder and kidnapping were against the weight of the evidence. We disagree.

█ The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Johnson*, 542 Pa. 384, 394, 668 A.2d 97, 101 (1995). An appellate court cannot substitute its judgment for that of the finder of fact. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982). Thus, we may only reverse the jury's verdict if it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Hawkins*, 549 Pa. 352, 368, 701 A.2d 492, 500 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685 (1998). Here, Appellant fails to establish, and our review of the record fails to convince us, that the jury's verdict was so contrary to the evidence as to shock one's sense of justice. Thus, Appellant's weight of the evidence claim affords him no relief.

III. *Appellant's claim that the trial court erred in denying his request for a tool mark examiner*

Appellant alleges that the trial court improperly denied trial counsel's request for a tool mark examiner because he needed such an examiner to challenge the Commonwealth's evidence that the duct tape used to gag Erica Miller came from the roll of duct tape in his car.[13] This claim is meritless.

On July 7, 1995, the trial court granted Appellant's motion for a private investigator and approved the expenditure of up to $3,000 for the investigator's services. On September 25, 1995, Appellant's trial counsel requested the trial court to appoint Gerald Styers, a tool mark examiner, at a cost of $500, to compare the duct tape found on Erica Miller with the roll of duct tape found in Appellant's car. At the time of counsel's request, the court refused to authorize the appointment and added the following notation in its ruling, "counsel apprised the same was included in the costs of a private investigator." Subsequently, the court clarified its notation concerning the tool mark examiner in an order, which granted the appointment of a psychiatrist to examine Appellant, by noting:

> We further note that the arresting or involved police officer has agreed to transport certain evidence to a Mr. Styers in Camp Hill for his evaluation and investigation and assistance in this criminal matter. . . . We note that the county is directed and is hereby authorized to advance Mr. Styers the sum of $500 for the undertaking of this, that sum to be and is considered a part of the $3,000 authorized by this Court.

Trial Ct. Ruling, 10/12/95, at 2. Therefore, we do not see how the trial court erred in refusing to appoint a tool mark examiner when according to the court's order, the tool mark examiner was appointed and the court authorized the funds for his examination. This claim offers Appellant no basis for relief.

13. Appellant has technically waived this claim because he did not raise it before the lower courts. However, since this is a death penalty case on direct appeal, we have nonetheless reviewed the claim. *See Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

IV. *Appellant's claims that the trial court abused its discretion in ruling on the admission of evidence*

Appellant contends that the trial court abused its discretion by allowing the Commonwealth to present expert testimony regarding the blow back theory because serologist Lee Ann Grayson was unable to scientifically establish the source of the blood found on Appellant's glove or Tom March's shotgun. For the reasons that follow, this claim fails.

The admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *See, e.g., Commonwealth v. Puksar,* 559 Pa. 358, 369, 740 A.2d 219, 225 (1999) (citing *Commonwealth v. Claypool,* 508 Pa. 198, 495 A.2d 176 (1985)).

At Appellant's trial, forensic pathologist Dr. Funke, ballistics expert Corporal Baltimore, and serologist Lee Ann Grayson all testified in relatively general terms about the blow back theory, which Corporal Baltimore explained during trial, is "often referred to as a phenomena of blood or flesh or tissue coming back towards the muzzle of a firearm—a discharged firearm after a person or an animal in some cases has been shot. . . ." N.T., 7/17/96, at 863. As the theory relates to the instant case, Ms. Grayson testified that due to the small amounts of blood she found present on Appellant's glove and Tom March's shotgun, she could not scientifically identify the source of the blood on either item.

Appellant argues that this testimony regarding the blow back theory was irrelevant and misleading because the source of the blood found on his glove and on the inside of Tom March's shotgun could not be scientifically identified. Appellant's argument fails, however, because the testimony of Dr. Funke, Corporal Baltimore, and Ms. Grayson regarding the blow back theory provided the jury with a potential scientific explanation for the presence of blood on both the outside of Appellant's left-hand glove and on the inside of the barrel of Tom March's shotgun. Moreover, if the jury accepted the blow back theory, this theory would strongly support the Commonwealth's position that Appellant murdered Erica Mil-

ler by shooting her in the head with Tom March's shotgun at close range. If anything, Ms. Grayson's inability to scientifically establish the source of the blood found on the glove and the shotgun would affect the weight to be given to the expert testimony on the blow back theory, not its admissibility. Thus, the trial court did not abuse its discretion by allowing the Commonwealth to present expert testimony on the blow back theory, and Appellant is not entitled to relief based on this claim of error.

Next, Appellant claims that the trial court abused its discretion by permitting Dr. Funke to testify as an expert on the blow back theory because she is a forensic pathologist and not a ballistics expert. We disagree.

In his brief to this Court, Appellant fails to point to the specific testimony which he objects to, and completely fails to establish how Dr. Funke's testimony on the blow back theory, which was essentially cumulative of Corporal Baltimore's and Ms. Grayson's testimony, prejudiced him. Notwithstanding Appellant's failure to present an adequate argument in support of his claim of error, a review of Dr. Funke's testimony regarding her qualifications clearly establishes that the trial court did not err by permitting her to testify as an expert on the blow back theory.

The purpose of expert testimony is to assist the factfinder in grasping complex issues not within the knowledge, intelligence, and experience of the ordinary layman. *See Commonwealth v. King*, 554 Pa. 331, 367, 721 A.2d 763, 781 (1998) (citing *Commonwealth v. Auker*, 545 Pa. 521, 543, 681 A.2d 1305, 1317 (1996)). Where a witness has a reasonable pretension to specialized knowledge on a subject matter under investigation, the witness may testify as an expert and the weight to be given such testimony is for the jury to decide. *King*, 554 Pa. at 367, 721 A.2d at 781; *Auker*, 545 Pa. at 543, 681 A.2d at 1317.

Dr. Funke testified that she is a medical doctor, that she is board certified in the areas of anatomic, clinical, and forensic pathology, that she has conducted more than 1000 autopsies,

and that she has been employed as a forensic pathologist since 1993. She further testified that in 1996, she attended a five-day class conducted by Herb McDonald, a recognized expert on blood spatter analysis. In addition, Dr. Funke testified that her training and practical experience conducting autopsies on homicide and suicide victims, including her observations of the homicide/suicide weapons and the victims' clothing, provided her with specialized knowledge about what happens to body fluids when they are subjected to a great amount of force. The trial court, in denying Appellant's post-sentence motions, explained its decision to permit Dr. Funke to testify regarding the blow back theory as follows:

> Dr. Funke described her educational background regarding the effect of a high impact blow to various parts of the body which included a course in blood spatter analysis. Dr. Funke also described her practical experience regarding the effects of a high impact blow such as a shotgun wound on bodily fluids including blood. Dr. Funke testified that she possessed both academic and practical training concerning what occurs to blood and fluids within the human body when they are subjected to substantial impact from a gunshot wound. Therefore, this Court correctly determined that she had specialized knowledge on the subject matter and correctly permitted her to testify, thus appropriately placing the weight to be accorded to her testimony in the hands of the jury.

Trial Ct. Op., 1/6/97, at 10. Given Dr. Funke's practical experience as a forensic pathologist and her educational experiences, including the class she attended on blood splatter, we find that the trial court did not commit an abuse of discretion by finding that Dr. Funke had a reasonable pretension to specialized knowledge on the blow back theory. Thus, Appellant is not entitled to relief based on this claim.

Next, Appellant argues that the trial court erroneously permitted a black and white autopsy photograph depicting the two shotgun wounds in the back of Erica Miller's head to be admitted into evidence. Appellant's claim fails.

The admission of photos of the corpse in a homicide case is a matter within the trial court's sound discretion. *Commonwealth v. Rush*, 538 Pa. 104, 111, 646 A.2d 557, 560 (1994). In exercising its discretion, the trial court must determine whether the evidentiary value of the photos outweighs the possibility that they will inflame the minds and passions of the jurors. *Id.*, 646 A.2d at 560.

Here, Appellant fails to offer any specific indication as to how the black and white autopsy photograph could have potentially inflamed the jurors' passions.[14] Appellant also fails to address the valid evidentiary purposes for which the Commonwealth sought to introduce the autopsy photograph, which were: (1) to help establish an essential element of the first-degree murder charge against Appellant (i.e., his intent to kill Erica Miller); and (2) to support forensic pathologist Dr. Funke's testimony that the shots which killed Erica Miller were fired from close range.[15] As we have previously stated, "the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs." *Commonwealth v. Jacobs*, 536 Pa. 402, 407, 639 A.2d 786, 789 (1994). In short, we find no error in the trial court's determination that the evidentiary value of the autopsy photograph in establishing Appellant's intent to kill and corroborating Dr. Funke's testimony regarding the manner in which Erica Miller was killed outweighed any possibility that the photograph would have inflamed the jurors' passions. Accordingly, we

14. Instead, Appellant contends that the autopsy photograph was merely cumulative of Dr. Funke's trial testimony. However, this claim is specious because, as discussed above, the photograph retained independent evidentiary value.

15. Dr. Funke testified that when a shotgun is fired at an individual from a close range, the entrance wound created by the shot is large and round in character. Dr. Funke further testified that the two entrance wounds in the back of Erica Miller's head were large and round, indicating that she was shot from close range. N.T., 7/17/95, at 799. The black and white autopsy photograph of Erica Miller's head show two large, round entrance wounds, which corroborate Dr. Funke's assertion that Erica Miller was shot from close range.

find that the trial court did not abuse its discretion in admitting the autopsy photograph.

■ Next, Appellant claims that the trial court abused its discretion by permitting Charlie Miller to testify regarding his telephone conversation with his sister prior to her disappearance. For the reasons that follow, Appellant's claim fails.

As noted in the previous discussion on the sufficiency of the evidence, Charlie Miller was permitted to testify at trial that his sister told him that she was going to get a job from Appellant for $15 an hour guarding a female victim/witness in a safe house. In a pre-trial hearing concerning the admissibility of Charlie Miller's testimony, the court ruled that his proposed testimony was admissible under the state of mind exception to the hearsay rule to circumstantially prove that shortly before her disappearance, Erica Miller intended to accept a job from Appellant guarding a female victim/witness in a safehouse, and subsequently acted in accordance with her stated intent. After Charlie Miller testified regarding his conversation with Erica, the court specifically instructed the jury that it could only consider the testimony to establish Erica Miller's intent at the time of the conversation. N.T., 7/16/96, at 555.

■ Appellant argues that the trial court erred in finding that Charlie Miller's testimony qualified under the state of mind exception to the hearsay rule. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999). The rule against admitting hearsay evidence stems from its assumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. *Commonwealth v. Rush*, 529 Pa. 498, 505, 605 A.2d 792 (1992). There are, however, several recognized exceptions to the hearsay rule. In the instant case, the trial court found that the testimony at issue met the well-established state of mind exception to the hearsay rule. *See Commonwealth v. Collins*, 550 Pa. 46, 703 A.2d 418 (1997); *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305 (1996).

This Court has explained the rationale underlying the state of mind exception to the hearsay rule as follows:

> Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is therefore because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized....

*Commonwealth v. Marshall,* 287 Pa. 512, 522, 135 A. 301, 304 (1926). Where the declarant's out-of-court statements demonstrate her state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception. *Commonwealth v. Riggins,* 478 Pa. 222, 234, 386 A.2d 520, 525 (1978) (quoting *Commonwealth v. Thomas,* 410 Pa. 160, 170, 189 A.2d 255, 260 (1963)). The determination of whether such statements are admissible is within the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. *Commonwealth v. Ragan,* 538 Pa. 2, 16, 645 A.2d 811, 818 (1994).

This Court has held that a deceased victim's out-of-court statements evincing an intent to meet the defendant shortly before the killing are admissible pursuant to the state of mind exception because such an intent provides circumstantial proof that the victim acted in accordance with his or her stated intent, and thereby provided the defendant with an opportunity to commit the crime in question. *See Collins,* 550 Pa. at 58 60, 703 A.2d at 424–25 (victim expressed both her intent to meet with defendant and her fear that he might harm her shortly before her death); *Commonwealth v. Lowenberg,* 481 Pa. 244, 253–55, 392 A.2d 1274, 1278–79 (1978) (victim told third person that she wanted to see the defendant concerning a serious financial matter); *Riggins,* 478 Pa. at 233–35, 386 A.2d at 525 (victim told third party that she expected defendant to visit at her home).

In the instant case, shortly before her disappearance, Erica Miller indicated that Appellant had offered her a job. Her statements to Charlie Miller regarding the job appear to have

been made in a natural manner during casual conversations, and provided the jury with circumstantial proof that Erica may have agreed to meet with Appellant to accept and/or commence the job that he offered her, thereby affording him an opportunity to kidnap and murder her. Thus, the trial court properly admitted Charlie Miller's testimony concerning his telephone conversation with his sister pursuant to the state of mind exception to the hearsay rule. *See e.g., Collins,* 550 Pa. at 58–60, 703 A.2d at 424–25.

Appellant essentially reiterates his argument with regard to Charlie Miller's testimony in his next claim. Appellant argues that the court erred in admitting Sharon Buckingham's testimony about her conversation with Erica Miller, in which Erica claimed that she was getting a classified government job, because Erica's statement to Sharon Buckingham was hearsay. For the same reasons that Charlie Miller's testimony was admissible under the state of mind exception to the hearsay rule, we likewise find that Sharon Buckingham's testimony was admissible.

 With regard to Sharon Buckingham's testimony, Appellant additionally argues that the trial court erred by not declaring a mistrial when Sharon Buckingham testified that Erica Miller told her that a man she knew as "Bill" [16] offered her a classified government job, because this information was not disclosed to Appellant during discovery. This claim fails.

 The trial court is in the best position to assess the effect of a prejudicial statement on the jury. Thus, the decision of whether to grant a mistrial is within the sound discretion of the trial court, and will not be reversed on appeal absent an abuse of that discretion. *See Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264, 1272 (2000); *Commonwealth v. Robinson,* 543 Pa. 190, 200, 670 A.2d 616, 621 (1995). The remedy of a mistrial is an extreme one that is required only when an incident is of such a nature that its unavoidable

16. By way of Brenda Miller's testimony, it was previously established that the Millers knew and referred to Appellant as "Bill." N.T., 7/16/96, at 518–19.

effect is to deprive the defendant of a fair and impartial trial by preventing the jury from weighing and rendering a true verdict. *Commonwealth v. Spotz*, 552 Pa. 499, 525, 716 A.2d 580, 592 (1998). Furthermore, a mistrial is not necessary if a court's cautionary instructions adequately cure any prejudice. *Id.*, 716 A.2d at 592.

At trial, Appellant's counsel objected to Sharon Buckingham's testimony that Erica Miller told her that "Bill" offered her the job. Appellant's counsel based his objection on the fact that in her earlier statement to the police, which Appellant's counsel received through discovery, Sharon Buckingham never revealed that Erica Miller said Bill offered her the job. Following the objection, the court excused the jury and asked Sharon Buckingham if she informed the police that Erica Miller told her that she was offered the job from Bill. Sharon Buckingham replied that:

I guess my mind was too fussed, and knowing who we were talking about, no, I did not. It was just an oversight. But that's exactly who we were speaking of.

N.T., 7/17/96, at 666–67. After learning that Sharon Buckingham never told the police that Erica Miller said that Bill offered her the job, the trial court determined that a mistrial was not warranted. Upon the jury's return, however, the court advised the jury that they could not attribute Sharon Buckingham's testimony that Erica Miller said Bill offered her a job to Appellant in any fashion. N.T., 7/17/96, at 668–69.

We do not believe that the trial court abused its discretion in refusing to declare a mistrial since the disputed testimony presented by Sharon Buckingham was not novel to the jury. The jury had already heard Charlie Miller's testimony, in which he stated that Appellant offered Erica Miller the job. Therefore, we do not believe that Sharon Buckingham's testimony had an unavoidable effect of prejudicing the jury so as to warrant a mistrial. *See Spotz*, 552 Pa. at 525, 716 A.2d at 592. Even if the jury had learned that Appellant offered Erica Miller a job from Sharon Buckingham, the trial court's contemporaneous instruction cured any prejudice that may have been imparted by the surprise testimony. *See id.*, 716

A.2d at 592; *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 274 (2000) (absent evidence to the contrary, the jury is presumed to have followed the court's instructions). Thus, this claim does not afford Appellant any relief.

Appellant also argues that the trial court erred in denying his motion for a mistrial based on Cheryl Smith's testimony that she was terrified when she called 911 to report the body found on her property because she "knew the way Appellant was." [17] For the reasons that follow, we find that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial.

Appellant argues, in a cursory manner, that the trial court abused its discretion in denying the motion because Smith's statement that she "knew the way Appellant was" created an impression in the jurors' minds that Appellant had a bad reputation before his reputation was properly at issue. However, the trial court found that, within the context in which the statement was made,[18] it was more likely that the statement created an impression that Cheryl Smith's fear "of the way Appellant was" did not reveal her awareness of Appellant's allegedly bad character, but stemmed from her just-confirmed suspicion that Appellant had killed and buried a 19 year-old girl on her property. In addition, the trial court noted that Cheryl Smith's improper comment was made in a passing nature, rather than purposefully elicited by the Commonwealth. *See Commonwealth v. Craft*, 455 Pa. 616, 619–20, 317 A.2d 213, 215 (1974) (passing references not prejudicial); *Commonwealth v. Fernandez*, 333 Pa.Super. 279, 287, 482 A.2d 567, 570–71 (1984) (defendant not prejudiced by witness'

**17.** It does not appear from the record that counsel for Appellant moved for a mistrial following Cheryl Smith's testimony. N.T., 7/16/96, at 586–88. However, the trial court, in its opinion addressing Appellant's post-sentence motions, treated the objection as such. Tr. Ct. Op., 1/6/97, at 21. As the trial court elected to consider the objection as if it were made, we shall do the same given that this is a capital case on direct appeal.

**18.** The testimony came out immediately after Cheryl Smith finished describing for the jury how she and Tom March discovered the body of Erica Miller.

statement that was neither intentionally elicited nor exploited by the prosecutor). Given these circumstances, the trial court found that the testimony did not deprive Appellant of a fair trial. We agree, and therefore find that the trial court did not abuse its discretion by denying Appellant's motion for a mistrial.

## V. Appellant's claims of prosecutorial misconduct

Appellant asserts that he was denied a fair trial because the prosecutor's opening remarks mischaracterized the nature of the blood evidence to be presented during the trial. We disagree.

A prosecutor's opening statements must be based on evidence that she plans to introduce at trial, and must not include mere assertions designed to inflame the jury's emotions. *Commonwealth v. Jones*, 530 Pa. 591, 607, 610 A.2d 931, 938 (1992). However, a prosecutor's opening statements may refer to facts that she reasonably believes will be established at trial. *Id.*, 610 A.2d at 938. Additionally, the prosecution, as well as the defense, is afforded reasonable latitude in presenting opening arguments to the jury. *Id.*, 610 A.2d at 938. Relief will be granted for prosecutorial misconduct only where the unavoidable effect of the prosecutor's conduct was to prejudice the jury so as to form in their minds a fixed bias towards the accused and to impede their ability to objectively weigh the evidence and render a true verdict. *Commonwealth v. Rainey*, 540 Pa. 220, 235, 656 A.2d 1326, 1334 (1995), *cert. denied* 516 U.S. 1008, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995).

Here, Appellant alleges that the prosecutor implied in her opening statements that serologist Grayson would show that the blood evidence found on Appellant's gloves and Tom March's gun was human blood, although the prosecutor knew that Grayson could not show that this was the case. Appellant challenges the following statements by the prosecutor:

Lee Ann Grayson ... will testify that she examined the blood-soaked waddings that were recovered from Erica

Miller's grave ... and that she determined that the blood on those shotgun shell waddings was the blood of Erica Miller. She will also testify that on the left hand of the pair of gloves that was seized from the Defendant at the time of his arrest was a small amount of blood, and in addition, she will testify that in the barrel of the shotgun that Tom March loaned the Defendant about the same time that Erica disappeared was also a small amount of blood.

N.T., 7/16/96, at 493–94. Contrary to Appellant's claim, nowhere in these remarks does the prosecutor state that Ms. Grayson would testify that the blood found on the gloves and the shotgun was from the victim or of human origin. Indeed, the prosecutor's remarks accurately represented Ms. Grayson's testimony that she found blood on Appellant's gloves and Tom March's shotgun. N.T., 7/18/96, at 890–98. Therefore, as the prosecutor's remarks were fairly based on the evidence at trial, we fail to see how the prosecutor's remarks impeded the jury's ability to objectively weigh the evidence. *See Jones,* 530 Pa. at 607–08, 610 A.2d at 939; *Rainey,* 540 Pa. at 235, 656 A.2d at 1334.

Furthermore, immediately following Appellant's objection to the prosecutor's remarks, the trial court cautioned the jury that the prosecutor's remarks were not evidence and that they could not infer from the prosecutor's remarks that the blood found on the gloves and shotgun was human blood. These instructions cured any prejudice imparted on the jury by the prosecutor's remarks. *Fletcher,* 750 A.2d at 273. Appellant contends, however, that the court's instruction did not cure the bias from the prosecutor's remarks because the prosecutor also mischaracterized the shotgun shell waddings as "blood soaked." Appellant also contends that the prosecutor's description of the waddings as blood soaked was not based on the evidence, and thus, that the prosecutor deliberately attempted to destroy the objectivity of the jury by creating ghastly images in the jurors' minds. These claims fail.

At trial, Ms. Grayson testified that the waddings were stained with human blood, dirt, and head and hair fragments.

N.T., 7/18/96, at 886. In addition, Corporal Baltimore testified that the waddings were "bloody" and "blood caked." N.T., 7/18/96, at 842–44. Therefore, the prosecutor's description of the waddings as blood soaked was a fair deduction from the evidence and within the bounds of oratorical flair. *See Jones,* 530 Pa. at 607, 610 A.2d at 938.[19]

Next, we address Appellant's claim that the prosecutor committed misconduct by questioning Appellant about his background in the Marine Corps merely to push Appellant's "hot buttons" and destroy his credibility before the jury.[20] We find no merit in Appellant's argument.

Our review of this claim is guided by the general rule of law, as previously discussed, that appellate courts will only grant relief for prosecutorial misconduct where the unavoidable effect of the prosecutor's actions was to prejudice the jury so that it destroyed the jury's ability to weigh the evidence in a neutral manner. *Rainey,* 540 Pa. at 235, 656 A.2d at 1334. Additionally, we note that in cross-examining a witness, an attorney is entitled to question the witness about subjects raised during direct examination as well as any facts tending to refute inferences arising from matters raised during direct testimony. *Commonwealth v. Karenbauer,* 552 Pa. 420, 439–40, 715 A.2d 1086, 1095 (1998); *Commonwealth v. Green,* 525 Pa. 424, 454, 581 A.2d 544, 558–59 (1990). Similarly, an attorney may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony. *Karenbauer,* 552 Pa. at 439–40, 715 A.2d at 1095. However, the scope and limits of cross-examination is vested

**19.** Appellant additionally claims that his trial counsel was ineffective for failing to object to the prosecutor's description of the shotgun waddings found at the crime scene as blood soaked. To prevail on a claim of ineffectiveness, the claimant must show that the underlying claim has arguable merit. *Douglas,* 558 Pa. at 432, 737 A.2d at 1199. As we find that the prosecutor's description of the waddings was reasonably based on the evidence, Appellant's ineffectiveness claim necessarily fails.

**20.** Again, this issue is technically waived because Appellant did not raise it in his post-trial motions but we will address it as this is a capital case on direct appeal. *Zettlemoyer,* 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

in the trial court's discretion and that discretion will not be reversed unless the trial court has clearly abused its discretion or made an error of law. *Id.*, 715 A.2d at 1095; *Commonwealth v. Hill*, 542 Pa. 291, 306, 666 A.2d 642, 649 (1995).

Appellant alleges that although the prosecutor knew, based on the expert testimony and psychiatric reports submitted at his competency hearing, that Appellant refused to disclose information about his Marine Corps' background, she nonetheless proceeded to ask Appellant a number of questions related to his Marine Corps' experience. According to Appellant, the prosecutor's questions were intended to "badger" him. Appellant's argument, however, ignores the fact that Appellant himself testified that he was a member of the Marine Corp in his direct examination. N.T., 7/18/96, at 931. Therefore, the prosecutor clearly was entitled to further explore this information and attack Appellant's credibility concerning this information on cross-examination. *Karenbauer*, 552 Pa. at 439–40, 715 A.2d at 1095. While questioning Appellant about these matters proved difficult because of Appellant's obstinate attitude about his military history, the prosecutor's attempts to inquire into this information was permissible and the court did not abuse its discretion by allowing it.[21]

VI. *Appellant's claim that the trial court erred in its instructions to the jury*

■ Appellant argues that the trial court issued an erroneous alibi instruction to the jury warranting the grant of a new trial. For the reasons that follow, Appellant's claim fails.

At trial, the trial court provided the following alibi instruction to the jury, which Appellant admits is in full accord with Pennsylvania's Standard Jury Instruction on Alibi, Pennsylvania Standard Jury Instruction, Criminal, § 3.11:

The Defendant has testified and offered evidence that he was not present at the scene, but, rather, was with his

21. In any event, the jury had already learned of Appellant's vague military history through Tom March's and Donald Christine's testimony, as well as Appellant's secretive military style line of work, by way of the testimony of Brenda Miller, Cheryl Smith, and Tom March.

family members, Joleen and her daughter. You should consider this evidence along with all the other evidence in the case in determining whether the Commonwealth has met its burden of proving beyond a reasonable doubt that a crime was committed and that the Defendant himself committed or took part in committing the crime. The Defendant's evidence that he was not present either by himself or together with other evidence may be sufficient to raise a reasonable doubt of his guilt in you minds. If you have a reasonable doubt of the defendant's guilt, you must find him not guilty.

N.T., 7/18/96, at 1063–64.[22]

Appellant attacks the validity of the trial court's alibi instruction on three bases. First, Appellant contends that the court's alibi instruction was defective because it did not include a specific, express instruction to the jury that any failure by the defendant to affirmatively prove his alibi defense is not itself a basis for a finding of guilt. Next, Appellant argues that the court's alibi instruction was erroneous because it did not include a specific, express admonition to the jury that the defendant does not have an affirmative duty to disprove any elements of the crimes charged against him. Finally, Appellant argues that the court's alibi instruction was defective because it failed to include a specific, express instruction to the jury that it could find reasonable doubt even if it did not wholly believe the defendant's alibi. None of Appellant's contentions have any merit.

■■ An alibi instruction is proper so long as, when taken as a whole, the instruction makes clear to the jury that a defendant's failure to prove the alibi is not in and of itself a basis for a finding of guilt and that a reasonable doubt could arise based upon alibi evidence even where the defense evidence is not wholly believed. *Commonwealth v. Saunders*, 529 Pa. 140, 602 A.2d 816 (1992). As we stated in *Saunders*:

**22.** In effect, Appellant's instant claim of trial court error constitutes an indirect attack on the validity of Pennsylvania's suggested standard jury instruction on alibi, since the trial court's instruction tracks the language of Pennsylvania's suggested standard jury instruction.

An [alibi] instruction is proper if it expressly informs the jury that the alibi evidence, either by itself or together with other evidence, could raise a reasonable doubt as to the defendant's guilt and clearly directs the jury to consider this evidence in determining whether the Commonwealth met its burden of proving beyond a reasonable doubt that the crime was committed by the defendant. A charge which meets this standard would not be taken to mean that by introducing alibi evidence the defense assumed a burden of proof, which, if not met, could provide a basis for a finding of guilt. Further, by instructing the jury that the defense evidence on alibi 'either by itself or together with the other evidence' could raise a reasonable doubt, the trial court correctly conveyed that a reasonable doubt could arise based upon alibi even where the defense evidence was not wholly believed.

*Id.* at 145, 602 A.2d at 818.

Here, the trial court instructed the jury to consider Appellant's alibi evidence along with all the other evidence in the case in determining whether the Commonwealth met its burden of proving beyond a reasonable doubt that a crime was committed and that Appellant committed the crime. Thus, the trial court's alibi instruction complied with the standard set forth by this Court in *Saunders*, clearly conveying to the jury that: (1) any failure on the part of Appellant to prove his alibi defense should not be considered a basis for a finding of guilt; (2) Appellant, as a criminal defendant, had no duty to disprove any of the elements of the crimes which he was charged with committing;[23] and (3) that a reasonable doubt

23. In addition, the trial court provided a specific instruction to the jury on this vital point of criminal law before it issued its alibi instruction. The trial court cautioned the jury that:

[T]he Defendant is presumed innocent throughout the trial and unless and until you conclude based on careful and impartial consideration of the evidence that the Commonwealth has proven him guilty beyond a reasonable doubt. It is not the Defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the Defendant is guilty of that crime beyond a

could arise based upon Appellant's alibi even if the jury did not wholly believe the alibi evidence. Therefore, the trial court's jury instruction was proper.[24]

## VII. *Appellant's claims that trial counsel was ineffective*

 Appellant raises numerous claims that his trial counsel was ineffective. This Court has long held that counsel is presumed to have rendered effective assistance, and the defendant has the burden to prove otherwise. *Commonwealth v. Balodis*, 560 Pa. 567, 747 A.2d 341, 343 (2000). In order for a defendant to obtain relief based on ineffective assistance of counsel, the defendant must show: (i) that the underlying claim is of arguable merit; (ii) that counsel had no reasonable basis designed to effectuate the defendant's interests for the act or omission in question; and (iii) that counsel's ineffectiveness actually prejudiced the defendant (i.e., but for counsel's ineffectiveness, there is a reasonable possibility that the outcome of the proceedings would have been different). *Douglas*, 558 Pa. at 432, 737 A.2d at 1199.

 (1) Appellant first claims that his trial counsel was ineffective for failing to object to the admission of several photographs of the gravesite. This claim fails.

It is well settled that the admission of photos of the corpse in a homicide case is a matter within a trial court's discretion, and such an admission will not constitute reversible error absent an abuse of discretion. *Rush*, 538 Pa. at 111, 646 A.2d at 560. In determining whether such photographs should be admitted, the trial court must determine whether the eviden-

reasonable doubt. The person accused of a crime is not required to present evidence or prove anything in his own defense.
N.T., 7/18/96, at 1050.

**24.** In conjunction with his claim that the trial court's instruction concerning his alibi defense was improper, Appellant alleges that his trial counsel was ineffective for failing to object to the trial court's instruction. The threshold of an ineffectiveness claim requires the underlying claim to be of arguable merit. *Commonwealth v. Douglas*, 558 Pa. 412, 432, 737 A.2d 1188, 1199 (1999). Thus, in light of our finding that the trial court's instruction correctly conveyed the law regarding an alibi defense to the jury, we fail to hold Appellant's counsel ineffective for objecting to the court's instruction.

tiary value of the photos outweighs the possibility that they will inflame the minds and passions of the jurors. *Id.,* 646 A.2d at 560.

The four photographs of the gravesite challenged by Appellant depict the gravesite as it appeared both prior to and during the police excavation. In three of the four photographs of the gravesite, Erica Miller's body is visible. At trial, the Commonwealth utilized these photographs to give the jury greater insight into the actual condition of the gravesite at the time that the police arrived at the scene, to corroborate Tom March's and Cheryl Smith's testimony regarding their partial excavation of the grave, and to document the ongoing grid excavation of the gravesite that the police employed in order to preserve the integrity of the evidence discovered there. In his brief to this Court, Appellant fails to acknowledge, much less discuss, the significant evidentiary value of the photographs of the gravesite. Appellant also does not indicate how the photographs of the gravesite, none of which included a close-up view of Erica Miller's body, inflamed the passions of the jurors.[25] That being the case, Appellant has failed to establish that the trial court abused its discretion by admitting the photographs of the gravesite into evidence and therefore, Appellant's claim of ineffectiveness necessarily fails.

■ (2) Next, we consider Appellant's claim that his trial counsel was ineffective for failing to investigate and present the testimony of Appellant's friend, George Landry. This claim also fails.

■ In order for a defendant to establish that he is entitled to relief based on a claim of ineffective assistance of counsel for failing to present a witness, he must prove that: (i) the witness existed; (ii) counsel was either aware of or should

**25.** Instead, Appellant mimics an argument he raised in connection with the admission of the autopsy photograph, contending that the photographs were merely cumulative of trial testimony and each other. This claim also fails here as the photographs were taken at different stages of the excavation and/or from different viewpoints, and thus, they had their own evidentiary importance.

have been aware of the witness's availability; (iii) the witness was willing and able to cooperate on behalf of the defendant; and (iv) the proposed testimony was necessary to avoid prejudice to the defendant. *See, e.g., Commonwealth v. Holland,* 556 Pa. 175, 727 A.2d 563, 566–67 (1999) (citing *Commonwealth v. Hall,* 549 Pa. 269, 290, 701 A.2d 190, 200 (1997)).

The gravamen of Appellant's argument is that he informed his trial counsel about presenting George Landry as a potential witness, but counsel never contacted Landry to determine whether or not he could provide valuable testimony on behalf of Appellant. At an evidentiary post-trial motion hearing, George Landry testified that: in 1987, Appellant cleaned his gun for him in a very meticulous manner; one time when Appellant was helping him with some yard work he saw Appellant pull a piece of duct tape from a roll, cut it with a knife, and then fold over the end of the tape on the roll; and one time he offered to loan Appellant a deer rifle to go hunting with, but Appellant declined the offer. Appellant contends that he was prejudiced by trial counsel's failure to present George Landry at his trial because his proposed testimony, as offered at the post-trial hearing, would have tended to rebut Tom March's testimony that Appellant borrowed his shotgun and only cleaned it up "a little bit" before returning it, as well as the fact that minute traces of blood were found in the barrel of the gun. In addition, Appellant contends that George Landry's testimony could have been used to counter Richard Buechle's testimony that the torn and jagged edge of the duct tape used to gag Erica Miller matched the torn and jagged edge of the roll of duct tape found in Appellant's car.

However, Appellant fails to establish, by way of affidavit or otherwise, that George Landry would have been ready, willing, and able to testify on his behalf at trial. Even assuming arguendo that George Landry would have been ready, willing, and able to testify at Appellant's trial, we fail to see how Appellant was prejudiced by the absence of George Landry's proposed testimony. First, we fail to see, and Appellant fails to explain, how George Landry's proposed testimony that

Appellant once declined an offer to borrow a rifle for deer hunting could have convinced the jury that Appellant would never borrow a firearm, much less how it could have created a reasonable probability that the jury would acquit Appellant of Erica Miller's murder. Next, we fail to see, and Appellant fails to explain, how George Landry's proposed testimony that Appellant once cleaned a gun for him in a "meticulous" fashion contradicts Tom March's trial testimony. Tom March testified at trial that when Appellant returned his shotgun, it had been cleaned up a little bit. Thus, Tom March's testimony in no way contradicts George Landry's proposed testimony that Appellant thoroughly cleaned one of his guns for him once. In addition, we fail to see, and Appellant fails to explain, how George Landry's proposed testimony that Appellant once cleaned a gun for him in a "meticulous manner" is inconsistent with the discovery of minute traces of blood at the end of the nozzle and in the interior of the barrel of Tom March's shotgun.[26] Finally, we fail to see, and Appellant again fails to explain, how George Landry's proposed testimony that he once saw Appellant cut a piece of duct tape and fold the end of the roll could have convinced the jury that Appellant would always do so, even if he were using the tape to gag a young woman before murdering her. Since Appellant fails to establish that he was prejudiced by the absence of Landry's proposed testimony, he is not entitled to relief based on this ineffectiveness claim.

██ (3) Appellant next argues that his trial counsel was ineffective for failing to present testimony from Ken Dawson, Sheila Kells, Joanne Probst and Angela Mummert to establish that Earl Mummert and Erica Miller had an abusive relationship, that they had a falling out prior to her disappearance, and that Earl Mummert was not seen in a restaurant that he frequented for a couple of days around the time of Erica Miller's disappearance. This claim fails.

**26.** Indeed, the amount of blood that Ms. Grayson was able to swab from the nozzle and barrel of the shotgun was so minute that she was not even able to determine whether or not the blood was human in origin.

First, Appellant fails to establish, by affidavit or otherwise, that Ken Dawson, Sheila Kells, Joanne Probst, or Angela Mummert would have been ready, willing, and able to testify on his behalf at trial in accordance with their testimony at the post-trial motions hearing. Even if they would have been ready, willing, and able to so testify, Appellant does nothing to refute the reasonableness of trial counsel's tactical decision not to present their testimony. At the post-trial motions hearing, Appellant's trial counsel testified that he considered presenting testimony tending to point a finger of suspicion at Earl Mummert, but opted against it because he believed that it would only offend the jury to do so absent any direct or circumstantial evidence linking Earl Mummert to the murder. Counsel further explained that central to his strategic decision not to deflect blame for the murder on Earl Mummert was the fact that absolutely no connection could be made between Earl Mummert and Tom March, on whose property Erica Miller was buried. N.T., 12/11/98, at 77. As Appellant fails to challenge the reasonableness of trial counsel's conclusion, he has not established that counsel was ineffective for failing to call Dawson, Kells, Probst and Angela Mummert's to testify at Appellant's trial. *See Commonwealth v. Howard,* 553 Pa. 266, 719 A.2d 233, at 237 (1998) (a court will not find that a chosen strategy lacked a reasonable basis unless it is proven that an alternative tactic not chosen offered a greater potential for success than the course pursued). Accordingly, Appellant's claim of ineffectiveness affords him no relief.

(4) Appellant claims that his trial counsel was ineffective for failing to cross-examine Donald Christine. This ineffectiveness claim also fails.

At trial, Donald Christine testified that in January of 1995, he was working as a manager for a business in the Delco Plaza mall when Appellant walked in one day and asked him if he would post missing person fliers with Erica Miller's picture on them. According to Christine, Appellant told him to call the police, then call him if he saw the girl on the poster, but asked him not to post the fliers for a few days, because otherwise he would get in trouble. According to Appellant, what he actual-

ly told Donald Christine was that he did not want Christine to get in trouble for posting the fliers, and to check with mall management first. Therefore, Appellant argues that if his trial counsel had cross-examined Donald Christine about the conversation, he would have dispelled the perception created by Christine's testimony that Appellant was trying to conceal something. Appellant, however, has done nothing to establish that any amount of cross-examination of Donald Christine would have caused Christine to alter his recollection of the conversation in any significant way. Thus, he cannot establish that the claim underlying his instant ineffectiveness claim has arguable merit, much less that he is entitled to relief based on the claim.

(5) Appellant argues that his trial counsel was ineffective for failing to investigate and present the testimony of two employees of the York Hospital who Appellant claims would have testified that Tom March and Erica Miller frequented the same drug dealer at the same time. This claim fails, as Appellant fails to establish, as is his burden, that the two unnamed "witnesses" even existed, much less that counsel was ineffective for failing to find them and present whatever testimony they might have had to offer. *See Holland*, 727 A.2d at 566–67.

(6) Appellant contends that his trial counsel was ineffective for failing to elicit testimony from Appellant that Tom March had the opportunity to plant evidence inside Appellant's car following the murder of Erica Miller. This claim fails for lack of arguable merit because Appellant actually testified at trial that Tom March had access to his car at least twice between the time that Erica Miller disappeared and the time that Appellant was arrested. N.T., 7/18/96, at 956.

(7) Appellant also claims that his trial counsel was ineffective for failing to effectively present his alibi defense because counsel did not present testimony of Appellant's "regimented" daily routine. This claim fails.

At trial, Appellant's counsel presented an alibi defense, complete with testimony from Appellant's girlfriend, Jolene

Brown, and Jolene's daughter, Heather Brown, that during the evening of January 17, 1995, the night Erica Miller disappeared, Appellant was at his home, which he shared with Jolene Brown. N.T., 7/18/96, at 989–90, 996–97. Additionally, Appellant, Jolene Brown, and Heather Brown each testified that on the morning of January 18, Appellant slept late and stayed at home with Jolene and Heather. N.T., 7/18/96, at 950–52. Appellant now argues that his counsel should have presented evidence of the high degree of regularity in his daily routine from Jolene, and Jolene's daughters, Heather and Jessica. Furthermore, Appellant claims that counsel should have offered testimony from two school children, Andre Hampton and LaTosha Leinheiser, who lived near Appellant's home. Appellant points out that at post-trial hearings, the Brown family confirmed the strict schedule in Appellant's and Brown's household and that Andre Hampton and LaTosha Leinheiser testified that Appellant routinely drove them to school in the morning. N.T., 12/11/98, at 14; 12/30/98, at 13–14, 34–35, 90–91. Nevertheless, Appellant fails to show, by affidavit or otherwise, that Jessica Brown, Andre Hampton, and LaTosha Lenheiser would have been ready, willing, and able to testify on his behalf at trial and would have offered testimony in accordance with the testimony they offered at the post-trial motions hearing. *See Holland,* 727 A.2d at 566–67.

Even assuming arguendo that they would have been ready, willing, and able to so testify, Appellant fails to offer a reasonable explanation as to how this testimony would have advanced the alibi defense that Appellant offered at his trial. Although Appellant claims that evidence of his strict daily routine would have established that any deviation by Appellant from his daily routine would have been noticed, he ignores the fact that the alibi defense he offered at trial established that January 18th, the morning after Erica Miller's disappearance, was not a typical morning. At trial, Appellant presented an alibi defense that on January 18th, Jolene Brown did not go to work, Heather Brown did not attend school, and Appellant slept late and thus, he did not drive Andre Hampton and LaTosha Leinheiser to school. Therefore, we fail to see how

evidence of Appellant's strict daily routines would have helped the alibi he offered at trial, and Appellant's claim necessarily fails for lack of arguable merit.

(8) Appellant claims that his trial counsel was ineffective for failing to present evidence that Appellant had vests that were not bulletproof. As Appellant makes no attempt to explain how he was prejudiced by counsel's failure to present evidence that he owned non-bulletproof vests, this claim fails.

(9) Appellant contends that his trial counsel was ineffective for failing to elicit testimony that Cheryl Smith was familiar with Appellant's vehicle. This claim also fails for lack of arguable merit.

At trial, Cheryl Smith testified that in January of 1995, Appellant asked Tom March if he could bury his box and conduct a prisoner exchange on the March/Smith property. Shortly thereafter, while Cheryl Smith was walking her daughter to the bus stop, she saw a car she recognized as Appellant's parked up against the barn. At trial, Cheryl Smith described Appellant's car as a silver Datsun station wagon with a CB antenna attached. Appellant argues that Cheryl Smith was very familiar with his car, having ridden in it numerous times, and therefore should have been able to describe the car in more detail. However, Appellant fails to indicate what additional details Smith should have provided about the appearance of his car. Indeed, a review of her testimony indicates that she described all of the readily apparent characteristics of Appellant's vehicle, down to the brand of the car and the fact that it was equipped with a CB antenna. Therefore, as Appellant fails to establish that his underlying claim has arguable merit, his claim of ineffective assistance of counsel fails.

(10) Next, we consider Appellant's claim that his trial counsel was ineffective for failing to introduce evidence to impeach Cheryl Smith's testimony that as she walked her daughter to the bus stop, she could see Appellant's car but could not see the grave site. Appellant contends that several photographic exhibits, which were admitted into evidence at

his post-trial motions hearings, establish that the gravesite would have been visible to a person walking along the driveway of the March/Smith property. However, even if Appellant's counsel presented evidence to establish that a person walking on the driveway would have had an unobstructed view of the grave site, Appellant does not explain how that fact would contradict Cheryl Smith's testimony that she saw Appellant's car, but did not see the gravesite. It is entirely possible that Cheryl Smith passed by the barn before Appellant dug Erica Miller's grave. In addition, Appellant fails to establish that there was a reasonable possibility that the outcome of his trial would have been different if such evidence had been presented. Accordingly, he is not entitled to relief based on this claim of ineffectiveness.

(11) Appellant argues that trial counsel was ineffective for failing to cross-examine Tom March about the specific time of day that he lent his shotgun to Appellant. Appellant argues that this line of questioning would have helped him establish his alibi defense. Appellant, however, offers no evidence that Tom March would have even remembered what time of day he lent his gun to Appellant, and thus, this claim lacks arguable merit. Moreover, Appellant also fails to rebut the reasonableness of counsel's strategy not to question Tom March about when he transferred his gun to Appellant. At a post-trial motions hearing, trial counsel testified that he decided not to ask Tom March about the time of the gun transfer because he did not want to place the gun in Appellant's hands at all, especially since the evidence did not establish a clear date when the gun was returned. N.T., 12/11/98, at 92–93. Therefore, this instant claim of ineffectiveness offers Appellant no relief.

(12) Appellant claims that his trial counsel was ineffective for questioning Commonwealth witness Detective Robert Eckenrode about the possible reasons why the police did not find any latent fingerprints on Tom March's shotgun. This ineffectiveness claim fails.

At trial, the Commonwealth offered Detective Eckenrode as an expert on the collection of latent fingerprints. Appellant's counsel asked Detective Eckenrode about the reasons why latent fingerprints were not found on Tom March's shotgun, and the detective answered that there were numerous reasons why identifiable prints might not be found on an object, including smudging, the temperature, and the nature of the surface of the object itself. N.T., 7/17/96, at 763–65. Appellant claims that this testimony cut against the defense's theory that Tom March and Cheryl Smith were framing Appellant for Erica Miller's murder. Accordingly, he argues that his trial counsel should not have asked the questions that led to those responses. Appellant, however, fails to establish that his trial counsel had no reasonable basis for questioning Detective Eckenrode as he did. Moreover, the testimony that his trial counsel elicited from Detective Eckenrode arguably cut just as much in favor of the defense as it did the prosecution, since it established that Appellant's fingerprints were not found on the weapon. Thus, Appellant also fails to show that he was prejudiced by the admission of the testimony. Consequently, the instant ineffectiveness claim affords him no relief.

(13) Next, we consider Appellant's various claims that his trial counsel was ineffective for failing to cross-examine certain Commonwealth witnesses about statements that they allegedly made before Appellant's trial that contradicted their testimony at trial. These claims lack merit.

In *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981), we stated that:

Assertions of ineffectiveness in a vacuum cannot be ineffectiveness. Counsel who is alleging ineffectiveness must set forth an offer to prove at an appropriate hearing sufficient facts upon which a reviewing court can conclude that trial counsel may have, in fact, been ineffective. This Court will no longer consider claims of ineffective assistance of counsel in the abstract.

*Id.* at 563, 424 A.2d at 1335. Thus, claims of inconsistent statements must be proven by evidence of record or else

claims of ineffectiveness that are based on a witness's alleged inconsistent statements are not properly before a reviewing court. *See Commonwealth v. Tanner,* 410 Pa.Super. 398, 407, 600 A.2d 201, 206 (1991). Moreover, trial counsel may make a tactical decision not to question witnesses about alleged inconsistencies so as not to enable witnesses to clarify their testimony and develop plausible explanations for apparent inconsistencies in their testimony. *Commonwealth v. Greene,* 702 A.2d 547, 557 (Pa.Super.1997).

Appellant baldly asserts that his counsel was ineffective for not cross-examining Tom March, Cheryl Smith, and Brenda Miller about statements they gave to the police which were allegedly inconsistent with their testimony at trial. However, the police reports, in which Tom March and Cheryl Smith allegedly made these contradictory statements, were never admitted into evidence. Furthermore, Appellant has not presented this Court with any additional evidence from Tom March, Cheryl Smith, or any police officers that March or Smith gave statements to the police that contradicted their trial testimony. Thus, there is no evidence of record that Tom March and Cheryl Smith made statements to the police that were inconsistent with their trial testimony. Since Appellant has not proven that his underlying claim is of arguable merit, his ineffectiveness claim must be rejected. *See Pettus,* 492 Pa. at 563, 424 A.2d at 1335.

Appellant also claims that his trial counsel was ineffective for not questioning Tom March about statements March made before Appellant's trial that were inconsistent with March's trial testimony. Specifically, Appellant contends that Tom March made statements during interviews at the prosecutor's office and at a preliminary hearing that were inconsistent with his trial testimony that Appellant asked him to bury a box in January of 1995. However, at the prosecutor's office as well as during the preliminary hearing, Tom March stated that Appellant asked him to bury the box after January 18, 1995. We do not see how Tom March's testimony is inconsistent from his pre-trial statements and therefore, this claim fails for lack of arguable merit.

In addition, Appellant argues that his trial counsel was ineffective because he failed to cross-examine Tom March about remarks he made at the prosecutor's office and during the preliminary hearing that were inconsistent with his trial testimony concerning when Appellant asked him to borrow a gun and when Appellant buried his box. Tom March testified at trial that around the same time Appellant asked him to borrow his gun, Appellant also asked March if he could bury a box on his property. Similarly, at the prosecutor's office, Tom March stated that Appellant buried the box a couple of days after he asked to bury it. During the preliminary hearing, Tom March testified that Appellant borrowed the gun a day or two before he asked to bury the box. In reading these three statements, we cannot find any contradictions about which Appellant's counsel should have questioned March. Accordingly, this claim is devoid of arguable merit.

Next, Appellant claims that his counsel failed to cross-examine Tom March and Cheryl Smith about inconsistencies in their testimony with regard to whether they knew when Appellant would bury his box. The record again belies any such inconsistency. Neither Tom March nor Cheryl Smith offered any testimony as to whether Tom March arranged a date or time to bury the box. Trial counsel will not be held ineffective for this baseless claim.

Appellant further alleges that his trial counsel was ineffective for failing to question Charlie Miller, Todd Schultz, and Sharon Buckingham about differences among their testimonies, in which they described their conversations with Erica Miller and the confidential job Erica Miller planned to accept. Upon examining the record, we find that any inconsistencies in the testimony of these witnesses were far too minor for us to find that trial counsel acted unreasonably by not pressing the witnesses about them on cross-examination. *See Commonwealth v. Baez*, 554 Pa. 66, 112, 720 A.2d 711, 733–34 (1998) (attorney not ineffective for failing to impeach a witness on a minor inconsistency between his preliminary hearing and his trial testimony). Accordingly, Appellant's claim lacks arguable merit and this claim of ineffectiveness fails.

Appellant also asserts that trial counsel was ineffective for failing to cross-examine Brenda Miller about possible inconsistent statements she made in police reports concerning the circumstances of her daughter's disappearance. These police reports, however, were not admitted into evidence, and Appellant does not present any other evidence to indicate that Brenda Miller made inconsistent statements. Thus, because Appellant does not offer any evidence of record to support his claim that Brenda Miller made contradictory statements, his ineffectiveness claim fails for lack of arguable merit. *See Pettus*, 492 Pa. at 563, 424 A.2d at 1335.[27]

■ (14) Appellant claims that his trial counsel was ineffective for failing to cross-examine the police about inconsistencies in their testimony at trial. For the reasons that follow, Appellant's claim fails.

Appellant initially asserts that trial counsel did not effectively cross-examine the police about discrepancies in their testimony concerning the location of the shotgun waddings found at the gravesite. Appellant notes that Officer Thomas R. McCune and Detective Eckenrode testified that both waddings were found in the hole, while Sergeant Ronald Shanabrook testified that one wadding was recovered from the hole, and the other was recovered during the sifting of the soil that was displaced during the excavation. However, Appellant fails to establish that there was a reasonable possibility that the outcome of his trial would have been different had his counsel questioned the officers about this discrepancy, if it can even be considered as such. *Douglas*, 558 Pa. at 432, 737 A.2d at 1199. Consequently, because we fail to see how trial counsel's omission prejudiced Appellant, this claim fails.

Appellant also claims that his trial counsel was ineffective for failing to cross-examine Sergeant Roger Johnson regard-

27. Moreover, even if the police reports were admitted into evidence, we fail to find an inconsistency between Brenda Miller's trial testimony that Erica Miller's cigarettes and lighter were left in her home and the alleged statement that Brenda Miller gave to the police, that Erica's cigarettes and contacts were at her home, but Erica's glasses were missing.

ing an alleged discrepancy concerning the time that Appellant was arrested on March 3, 1995. As discussed above, Appellant has the burden of establishing a factual basis to support his claim that there was evidence inconsistent with Sergeant Johnson's testimony, which his trial counsel should have used for impeachment purposes. *Tanner*, 410 Pa.Super. at 407, 600 A.2d at 206. At trial, Sergeant Johnson testified that Appellant was arrested at approximately 11:40 a.m. on March 3, 1995. According to Appellant, Sergeant Johnson's testimony was inconsistent with a police report completed by Sergeant Johnson's partner, Officer William Moncuse, which stated that the arrest occurred at 12:50 p.m. However, Officer Moncuse's alleged report was never admitted into evidence. Additionally, Appellant did not subpoena Officer Moncuse or Sergeant Johnson to testify at the post-trial hearings about the alleged report. Therefore, because Appellant has not provided any evidence to support his claim that there were discrepancies in Sergeant Johnson's testimony, his claim that trial counsel was ineffective for not pointing out those alleged discrepancies must fail. *See id.*, 600 A.2d at 206.

Appellant also claims that trial counsel should have cross-examined Detective Eckenrode about the time that the police executed a search warrant for Appellant's car. At trial, Detective Eckenrode testified that Appellant's car was first secured in a garage at 12:50 p.m. and then a search warrant was executed for the car. According to Appellant, however, Officer Moncuse's report stated that the car was towed at 2:00 p.m., and thus, the search warrant could not have been executed at 12:50 p.m., as Detective Eckenrode testified. As there is no evidence of record of Officer Moncuse's report or post-trial testimony by Officer Moncuse or Detective Eckenrode substantiating what Appellant claims was in the report, Appellant does not present sufficient evidence for this Court to find that his underlying claim has arguable merit. *Id.*, 600 A.2d at 206. Accordingly, the instant claim fails.

Additionally, Appellant argues that trial counsel was ineffective for not effectively cross-examining Detective Eckenrode regarding his testimony that Appellant's car was secured with

evidence tape before it was searched. According to Appellant, his trial counsel should have questioned Detective Eckenrode about how the car was secured because Officer Moncuse's report did not include this information within the description of Appellant's arrest. Appellant, however, does not present any evidence to show that Officer Moncuse's report did not in fact state that the car was secured by evidence tape. *Id.,* 600 A.2d at 206. Thus, the instant claim of ineffectiveness fails for lack of arguable merit.

Next, Appellant claims that trial counsel was ineffective for failing to elicit testimony from the police that they returned to the gravesite at least twice after their initial dig on March 2, 1995. At trial, Sergeant Shanabrook testified that the police conducted a second dig on March 13, 1995, and the police found shotgun waddings during the dig. Appellant claims that police reports indicate that the police visited the gravesite on two other occasions, on March 4, 1995, and on March 14, 1995. Again, however, the police reports were not admitted into evidence and Appellant fails to provide us with any other factual evidence of subsequent searches on March 4th and March 14th. *Id.,* 600 A.2d at 206. Accordingly, this claim also lacks arguable merit.

(15) Appellant argues that his trial counsel was ineffective for not questioning the police about a tarp they used to cover the gravesite because the tarp may have contaminated the evidence. Appellant fails to prove that any evidence was actually contaminated and thus, we deny this speculative claim for lack of underlying merit.

(16) Appellant claims that trial counsel was ineffective for not questioning the police about the fact that a cigarette butt was found at the gravesite since he did not smoke cigarettes at the time Erica Miller was killed. However, we fail to see, and Appellant fails to explain, how counsel's omission prejudiced him since both Tom March and Cheryl Smith testified that they were smoking cigarettes when they started to dig the gravesite and that they may have discarded

a cigarette at that time. N.T., 7/16/96, at 592–93; 7/17/96, at 648. Thus, we reject this claim of ineffectiveness.

(17) Next, we address Appellant's claim that trial counsel was ineffective for not eliciting testimony that an entry in his daily planner read "hike farm," rather than "hide form." This claim also fails.

At trial, Detective Eckenrode testified that an entry in Appellant's planner on January 17, 1995, appeared to state "hide form." Defense counsel did not question Detective Eckenrode about the words in the January 17th entry. At the post-trial motions hearing, Appellant testified that the entry actually stated "hike farm." N.T., 12/30/98, at 63–64. Appellant argues that trial counsel's failure to challenge Detective Eckenrode's testimony that the entry said "hide form" prejudiced him because the jury was left with the impression that he was hiding something on the day that Erica Miller disappeared. However, Appellant completely fails to show that there was a reasonable possibility that the outcome of his trial would have been different had trial counsel elicited testimony to impeach Detective Eckenrode's testimony that the statement appeared to say "hide form." *Id.*, 737 A.2d at 1199. Thus, Appellant is not entitled to relief based on this claim of ineffectiveness.

(18) Appellant alleges that trial counsel was ineffective for failing to establish that Appellant went to Tom March's workplace at the request of Tom March and Cheryl Smith. This claim fails.

At trial, Tom March testified that Appellant visited him more frequently after Appellant told March where he buried his box. Appellant's counsel questioned Appellant about the reason for the increase in his visits with Tom March, to which Appellant answered that he saw March frequently in January because he was providing March with marijuana as well as counseling March about March's alleged drug problem. Therefore, Appellant himself provided the explanation for his increased contacts with March and at no point during that explanation did Appellant mention that he went to March's

workplace based on requests by March and Smith. Furthermore, Appellant fails to prove that there was a reasonable possibility that this added information would have altered the jury's verdict, and thus, this claim is unsuccessful.

■ (19) Next, we consider Appellant's claim that trial counsel was ineffective for failing to impeach Detective Eckenrode's testimony that Appellant was right handed. This claim fails for lack of arguable merit.

At trial, Detective Eckenrode testified that during his arrest of Appellant, he noticed Appellant was right handed. Appellant claims that trial counsel was ineffective because he did not challenge Detective Eckenrode's observation that Appellant was right handed or elicit testimony from Appellant about the fact that he was ambidextrous.[28] Furthermore, Appellant claims that he was prejudiced by counsel's ineffectiveness because Detective Eckenrode's testimony supported the Commonwealth's blow back theory.[29] However, we fail to see how Appellant's ability to shoot with both his right and left hands undermines the blow back theory. Moreover, there was no definitive testimony that blood was left on the left-hand glove as a result of "blow back." Accordingly, there is no merit to this claim.

■ (20) Appellant argues that trial counsel was ineffective for failing to present testimony that he used his black gloves for hunting, which would have helped him prove that the blood found on the gloves was animal blood. Despite this claim, Appellant offers absolutely no proof that the blood on the gloves was from an animal. Furthermore, Appellant disregards the fact that the evidence presented by the Commonwealth at trial established that the blood could have been from either a human or an animal. Thus, the jury was aware that the blood may have come from an animal, and was also

28. Appellant testified in the post-trial evidentiary hearing that he shoots with both his left and right hands. N.T., 12/30/98, at 71.

29. A small amount of blood of an unknown origin was found on Appellant's left-hand glove. Under the blow back theory, it is possible that the blood stained the glove because Erica Miller was shot at close range.

aware, as a result of Tom March's testimony, that Appellant hunted regularly. N.T., 7/17/96, at 652–53. Thus, there is no merit to Appellant's underlying claim and trial counsel cannot be deemed ineffective for this meritless claim.

(21) Appellant alleges that trial counsel was ineffective for failing to object to the Commonwealth's cross-examination of Appellant regarding the charge of possession with intent to deliver. We disagree.

Appellant was charged with possession with intent to deliver after the police discovered marijuana in his car. Upon Appellant's pre-trial motion, the court severed the possession charge from the criminal homicide and kidnapping charges and precluded evidence of Appellant's drug possession in his trial for the murder and kidnapping charges. However, at Appellant's trial for murder and kidnapping Erica Miller, Appellant testified that his contact with Tom March increased in January because he was providing March with drugs. N.T., 7/18/96, at 937–38. Thus, once Appellant opened the door to this evidence, the Commonwealth was free to further cross-examine Appellant about it. *Karenbauer*, 552 Pa. at 439–40, 715 A.2d at 1095. Additionally, at a post-trial motions hearing, trial counsel stated that he warned Appellant not to discuss Tom March's drug activity, but Appellant believed that this testimony was important to his defense. N.T., 12/11/98, at 84. Given that Appellant made his own strategic decision to testify about this evidence, we do not find that trial counsel's failure to object to the Commonwealth's cross-examination prejudiced him. Accordingly, Appellant is not entitled to relief.

(22) Appellant additionally alleges that trial counsel was ineffective for failing to cross-examine serologist Grayson about her training and experience as an expert in blood stain patterns because she had only testified as an expert on one prior occasion. This claim is meritless.

Ms. Grayson testified that she was employed in the serology unit of the Pennsylvania State Police Crime Laboratory and that she had completed five courses, including one advanced course in bloodstain analysis. She further testified that al-

though she had only testified once before as an expert in the area of bloodstain analysis, she had testified as an expert in the area of serology approximately 35 times. Despite the fact that Ms. Grayson had only testified on one prior occasion as a blood stain expert, the court qualified Ms. Grayson as an expert in blood stain/splatter analysis based on her other indisputable qualifications, including her practical experiences as a serologist and her extensive training in blood stain analysis.[30] Furthermore, because Ms. Grayson readily admitted before the jury that she had only testified once before as a bloodstain expert, the jury was aware of this information even though defense counsel did not cross-examine Ms. Grayson about it. Thus, the jury was free to consider this information in weighing Ms. Grayson's testimony. Given these circumstances, Appellant's claim that defense counsel was ineffective for failing to cross-examine Ms. Grayson about this information fails.

(23) Next, we consider Appellant's claim that trial counsel was ineffective for failing to question Detective Eckenrode about his qualifications as an expert in the area of latent fingerprints. The gist of Appellant's argument is that by questioning Detective Eckenrode, defense counsel could have established that the detective was not qualified as an expert on latent fingerprints and thus, blocked his testimony from being admitted at trial. However, Appellant fails to present any evidence that suggests that Detective Eckenrode was not qualified to testify about latent fingerprints.[31] Thus, this claim fails for lack of arguable merit.

30. Based on her experiences as a serologist and her educational experiences in the area of bloodstain analysis, we agree with the trial court's finding that Ms. Grayson had specialized knowledge in bloodstain analysis so as to qualify as an expert. *See King*, 554 Pa. at 367, 721 A.2d at 781.

31. According to Detective Eckenrode's testimony, he was trained in evidence collection, including the collection of latent fingerprints, not only through courses at the police academy, but also through courses in basic crime scene processing and an eighty-hour training course for evidence technicians. N.T., 7/17/96, at 755. Therefore, based on Detective Eckenrode's training and experiences as a police officer, the trial court was justified in finding that he had a reasonable pretension

 (24) Appellant argues that trial counsel was ineffective for not moving to suppress the evidence seized from his car because the search warrant stated that the search took place a half hour before the warrant was approved by the district justice. This claim also fails.

The search warrant executed by Detective Eckenrode on March 3, 1995 notes that Appellant's car was searched at 12:50 p.m., but also states that the warrant was approved by the district justice at 1:15 p.m. Appellant asserts that trial counsel should have moved to suppress the evidence obtained from the search of his car based on the inconsistent times in the warrant. However, at a post-trial evidentiary hearing, Detective Eckenrode explained the discrepancy by stating that he recalled writing down the time the police seized and impounded Appellant's car on the warrant, rather than the time the car was searched. N.T., 12/8/98, at 128. This testimony was consistent with Detective Eckenrode's testimony at trial and that of his colleague, Sergeant Johnson, that the police arrested Appellant at approximately 11:40 a.m., and that subsequent to Appellant's arrest, the police impounded, towed, and secured the car at the police station while they obtained a warrant. N.T., 7/17/97, at 693–94, 745–48; *see also South Dakota v. Opperman,* 428 U.S. 364, 368–70, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Commonwealth v. Scott,* 469 Pa. 258, 267, 365 A.2d 140, 144 (1976).

 An error in a warrant is fatal only if it deprives a reviewing court of the ability to review the propriety of the issuance and execution of the warrant. *See Commonwealth v. Hamlin,* 503 Pa. 210, 469 A.2d 137 (1983). In *Hamlin,* the appellant claimed that evidence seized on the basis of a warrant should have been suppressed because the magistrate approved the warrant on September 5th, but mistakenly marked the issuance date on the warrant as September 6th. *Id.* at 213, 469 A.2d at 138. This Court held that because the evidence was uncontroverted that the warrant was applied for on September 5th, and because there was insufficient evidence

in the collection of latent fingerprints in order to qualify as an expert. *See King,* 554 Pa. at 367, 721 A.2d at 781.

to show that the magistrate purposely postdated the search warrant, the appellant did not prove that he was prejudiced by the mistake in the warrant. *Id.* at 216–17, 469 A.2d at 140. *See also Commonwealth v. Graham,* 334 Pa.Super. 170, 482 A.2d 1277 (1984) (suppression of evidence not warranted where the record, which included the affiant's testimony, indicated that the warrant was secured at 3:30 p.m., although the warrant stated that it was issued at 3:30 a.m.).

Here, Appellant has not presented any evidence to show that the search warrant was actually executed a half hour before it was issued or to rebut Detective Eckenrode's explanation that he mistakenly wrote the time the car was seized on the warrant, as opposed to the time the car was searched. Moreover, Appellant has failed to prove that a suppression court would not have merely amended the warrant to correct Detective Eckenrode's mistake.[32] Therefore, because there is nothing to indicate that Detective Eckenrode did anything other than inadvertently write down the time the car was seized on the warrant, and because there is no evidence of a deliberate attempt by the police to conduct an illegal warrantless search, Appellant's ineffectiveness claim fails.

 (25) Lastly, we address Appellant's contention that his trial counsel was ineffective for failing to exclude testimony from Donald Christine and Tom March that Appellant stated that he was in the Marines and fought in Vietnam. Since Appellant himself testified that he was in the Marines, we fail to see how Appellant was prejudiced by the introduction of evidence he voluntarily presented to the jury on his own. Furthermore, Appellant does not show that there was a reasonable possibility that the Commonwealth's presentation of this evidence would have altered the outcome of his trial. Therefore, we do not find that trial counsel was ineffective in this regard.

32. "A .... warrant may be amended at any time so as to remedy any defect in form or content that is not prejudicial to the 1ights of the defendant." Comment to Pa.R.Crim. P. 109.

VIII. *Appellant's claim that the trial court abused its discretion in imposing the maximum sentence for Appellant's kidnapping conviction*

Appellant asserts that the trial court abused its discretion by sentencing Appellant for his kidnapping conviction to a term outside of the Sentencing Guidelines. This claim fails.

A defendant cannot appeal as of right from the discretionary aspects of a sentence. 42 Pa.C.S. § 9781(b). In order to appeal the discretionary aspects of a sentence, the defendant must set forth in his brief a statement of the reasons relied upon for allowance of appeal, and such statement must precede the defendant's argument on the merits. Pa.R.A.P. 2119(f). Further, the defendant's statement must raise a substantial question as to whether the court properly considered the sentencing guidelines. *Commonwealth v. Koehler, Jr.*, 558 Pa. 334, 737 A.2d 225, 244 (1999).

Here, because Appellant claims that his kidnapping sentence was excessive, he challenges a matter within the trial court's discretion. Appellant specifically claims that the trial court imposed a sentence outside the Sentencing Guidelines based on insufficient factors. Therefore, although the Commonwealth argues otherwise, Appellant adequately states the reasons for his challenge to the discretionary aspects of his sentence in his brief. Additionally, we find that Appellant has raised a substantial challenge to the appropriateness of his sentence, and therefore we will address the merits of his claim. *See id.*, 737 A.2d at 244; *Commonwealth v. Tuladziecki*, 513 Pa. 508, 513, 522 A.2d 17, 20 (1987).

In fashioning a sentence, the trial court must impose a term of confinement consistent with the protection of the public, the gravity of the offense as it relates to the impact of the victim and to the community, and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721. The trial court is vested with broad discretion in determining the defendant's sentence since the court is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime. *Com-*

*monwealth v. Ward, Jr.*, 524 Pa. 48, 52, 568 A.2d 1242, 1243 (1990). Although the trial court must consider the Sentencing Guidelines, the court is not obligated to impose a sentence deemed appropriate under the Sentencing Guidelines. *Saranchak*, 544 Pa. at 177 n. 18, 675 A.2d at 277 n. 18. At the same time, the trial court cannot justly sentence a defendant unless it possesses sufficient and accurate information about the circumstances of the offense and the character of the defendant to formulate its judgment. *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12 (1988). In imposing a defendant's sentence, the trial court must state the reasons for the sentence on the record. 42 Pa.C.S. § 9721; Pa.R.Crim.P. 1405(b). As long as the trial court's reasons demonstrate that it weighed the Sentencing Guidelines with the facts of the crime and the defendant's character in a meaningful fashion, the court's sentence should not be disturbed. *Devers*, 519 Pa. at 101, 546 A.2d at 18.

In the instant case, Appellant was sentenced to a term of ten to twenty years for kidnapping Erica Miller, a term outside of the Sentencing Guidelines. In describing the reasons for Appellant's sentence, the trial court stated:

We, accordingly, find the following aggravating circumstances based upon the factual determination by the jury and the subsequent report. We conclude that the offense, which is the underlying element of the within charges and attendant circumstances of the offense, that includes the taking of the life of an individual in a remote area encased with gauze and without clothing during the time of year, may be perceived as a deliberate assassination to the victim and which would have inevitably inflicted mental cruelty on her in the course of the event. The offender shows no remorse. The offender continues to be non-cooperative with the authorities even in an attempt to assist in evaluation of his personal history for purposes of aiding the Court in preparing a pre-sentence investigation; and the offender is a danger to society.

N.T., 8/26/96 at 9. Appellant argues that the trial court could not impose a sentence outside the Sentencing Guidelines based

upon the reasons that are quoted above. Specifically, Appellant claims that the trial court should not have considered either his lack of remorse, since he maintained his innocence throughout the trial, or his failure to cooperate with the authorities.

We first note that the trial court was not required to issue a sentence in accordance with the Sentencing Guidelines as long as it considered the Guidelines along with Appellant's character and the charged offenses in sentencing Appellant. *See Saranchak*, 544 Pa. at 158, 177 n. 18, 675 A.2d 268, 277 n. 18; *Devers*, 519 Pa. at 101, 546 A.2d at 18. Before imposing Appellant's sentence, the court explained that it had reviewed the results of the pre-sentence investigation, the Probation Department's recommendation, the psychiatrists' reports concerning Appellant's competency, and had also noted Appellant's demeanor and attitude during the trial. Furthermore, the court acknowledged that the Sentencing Guidelines suggested a minimum sentence of 30 to 48 months, and a maximum term of 60 months. Based on these statements, we believe that the trial court possessed adequate information of Appellant's character and the offenses for which he was charged, and that the court weighed this information along with the Sentencing Guidelines, to form an appropriate sentence.

We also find that the court did not err in relying on Appellant's lack of remorse or lack of cooperation in fashioning a sentence outside of the Guidelines. Clearly, both Appellant's lack of contrition and Appellant's lack of cooperation with the authorities were signs of Appellant's character. The fact that Appellant did not show any remorse after a jury found beyond a reasonable doubt that he murdered Erica Miller, a girl he once treated as a daughter, even if he maintained his innocence, was indicia of Appellant's social conscience. *Commonwealth v. Miller*, 555 Pa. 354, 368–69, 724 A.2d 895, 902 (1999); *Commonwealth v. Gallagher*, 296 Pa.Super. 382, 386, 442 A.2d 820, 822 (1982). Similarly, Appellant's refusal to cooperate with the authorities on simple matters, such as stating his family history and health prob-

lems, was a gauge of Appellant's potential for rehabilitation. *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *Commonwealth v. Constantine*, 478 A.2d 39, 40, 329 Pa.Super. 212, 216 (1984). Therefore, because both these factors were aspects of Appellant's character, the trial court properly considered them along with the offenses charged and the Sentencing Guidelines to form a sentence consistent with protecting the public, the gravity of the offense, and Appellant's rehabilitative needs. *See Devers*, 519 Pa. at 101, 546 A.2d at 18. Since we find that the trial court did not abuse its discretion in relying on Appellant's lack of contrition and lack of cooperation.

## IX. *Appellant's claim that the trial court erred in instructing the jury during the penalty phase*

■ Appellant argues that the trial court erred during the penalty phase of his trial by: (1) failing to specifically instruct the jury that an individual juror could find the existence of a mitigating circumstance even if the other jurors did not find it; and (2) suggesting to the jury that it could only find the existence of a mitigating circumstance if all of the jurors agreed that it existed. Appellant contends that the trial court's inadequate and erroneous jury instruction entitles him to a new penalty phase hearing under *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). We agree.

■ In death penalty deliberations, there is no requirement of unanimity as to the jurors' findings on the particular mitigating factors presented by the defense. In *Mills v. Maryland*, the United States Supreme Court held that jury instructions in a death penalty case which create a "substantial probability" that jurors would erroneously believe that they must unanimously agree on the existence of a mitigating circumstance before considering it in the weighing process violate the Eighth and Fourteenth Amendments to the United States Constitution. *Id.* at 384, 108 S.Ct. 1860. The United States Supreme Court has since clarified the standard it enunciated in *Mills*, holding that the proper inquiry is whether there is a "reasonable likelihood" that the jury applied the

challenged jury instruction in a way that prevented it from considering constitutionally relevant mitigating evidence. *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

 A trial court's failure to specifically instruct the jury that unanimity is not required in order for them to find that a mitigating circumstance existed does not, in and of itself, create a reasonable likelihood that jurors would erroneously infer such a requirement. *Commonwealth v. Holland,* 556 Pa. 175, 185, 727 A.2d 563, 568 (1997); *Commonwealth v. Banks,* 540 Pa. 143, 149–50, 656 A.2d 467, 470 (1995). However, where a jury has been instructed that unanimity was required when finding mitigating circumstances, a death sentence must be vacated. *Commonwealth v. Billa,* 521 Pa. 168, 186, 555 A.2d 835, 844 (Pa.1989); *see also Holland,* 556 Pa. at 185, 727 A.2d at 568 ("where there is a high risk that instructions could be understood as requiring unanimity as to mitigating circumstances, the sentence must be vacated").

In the instant case, the trial court instructed the jury as follows:

Your verdict must be a sentence of death if you unanimously find, that is, all of you find at least one aggravating and no mitigating circumstance or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstance.

If you do not all agree, that means you cannot reach the unanimous verdict on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment.

N.T., 7/17/96, at 1170–71. This Court has previously reviewed this instruction and found that it, standing alone, does not violate *Mills. Commonwealth v. Banks,* 540 Pa. 143, 149–50, 656 A.2d 467, 470 (1995). Following the above instruction, however, the trial court discussed the verdict slip with the jury, explaining as follows:

You will remember I called upon you to weigh the aggravating versus the mitigating circumstance.

The aggravated circumstance unanimously found is, and you designate that aggravating circumstance. *The mitigating circumstances found by you unanimously are or is.*

Two [if], the mitigating circumstance is not outweighed by the aggravating circumstance, then you go on to provide what you found unanimously to be the mitigating circumstance or circumstances and the aggravating circumstance unanimously found.

N.T., 7/19/96, at 1174–75 (emphasis added).

We believe that the above-quoted excerpt from the trial court's jury instructions, when considered in conjunction with the fact that the trial court did not explicitly inform the jurors that any one or more of them could find the existence of a mitigating circumstance, created a reasonable likelihood that the jurors concluded that they needed to unanimously agree that a mitigating circumstance existed in order to consider that mitigating circumstance.[33] Given this uncertainty, we must vacate the judgment of sentence and remand this matter to the trial court for a new sentencing hearing.[34]

For the foregoing reasons, we affirm Appellant's convictions for kidnapping and first-degree murder. However, we vacate Appellant's judgment of sentence and remand this case to the Court of Common Pleas of York County for a new sentencing hearing in accordance with 42 Pa.C.S. § 9711. Jurisdiction relinquished.

**33.** We recognize that the verdict slip used by the jury during deliberations directed the jury to list and consider the aggravating circumstance(s) that it found unanimously, while at the same time directing the jury to list and consider the mitigating circumstance(s) that any one or more of them found. However, we cannot assume that the language in the verdict slip alleviated the error in the court's instructions given that the erroneous instruction was made during that portion of the charge where the court was explaining how to fill out the verdict slip. In addition, although the court initially told the jury to read the verdict form before they began deliberations, the court later instructed the jury not to fill out the form until its deliberations were concluded.

**34.** In light of our finding that the penalty phase of Appellant's trial must be reversed, we need not address Appellant's remaining challenges relating to the penalty phase of his trial.